IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DR. THOMAS C. WELTON and
MARY E. WELTON,

         Plaintiffs,

v.                                   Case No. 14-cv-4066-DDC-KGG

AMCO INSURANCE COMPANY,

         Defendant.

**MEMORANDUM AND ORDER**

      Plaintiffs Dr. Thomas C. Welton and Mary E. Welton bring this lawsuit claiming that defendant AMCO Insurance Company failed to pay the total amount of damages caused by a fire and collapse in part of their home. This matter comes before the Court on plaintiffs' Motion for Summary Judgment (Doc. 25). Plaintiffs ask the Court to find that defendant's March 16, 2012 "denial of Plaintiffs' claim of collapse based upon the general exclusions of 'settlement' or 'earth movement' was an error as a matter of law." Doc. 25 at 1 (emphasis omitted). Plaintiffs also ask the Court to grant summary judgment against all affirmative defenses that defendant has asserted relying on its general policy exclusions. *Id*. Defendant has filed a Memorandum in Opposition (Doc. 33), and plaintiffs filed a Reply (Doc. 37). Plaintiffs also have filed a document, labeled a "Notice of Supplemental Authority" (Doc. 87). It advances additional facts and exhibits which, they contend, support their motion. For reasons explained below, the Court denies plaintiffs' motion.

I.      **Plaintiffs' Notice of Supplemental Authority**

      Before reaching the merits of plaintiffs' motion, the Court, first, must determine whether to consider the supplemental facts and exhibits plaintiffs submitted after briefing on their motion

1

had closed. On January 29, 2016, plaintiffs filed a document called "Supplemental Authority in Support of Plaintiffs' Motion for Summary Judgment on Collapse" (Doc. 87).[1] In it, plaintiffs set out 17 pages of facts—referred to as a "Statement of Supplemental Uncontroverted Collapse Authority." Doc. 87 at 2-8. Plaintiffs attempt to support those facts in this supplement by attaching a number of photographs, deposition transcripts, and expert reports. *See* Docs. 87-93, 102-03. The depositions were taken and the expert reports were submitted after plaintiffs had submitted their motion. The photographs were taken before plaintiffs had submitted their motion and they purport to show the condition of the home before and after the collapse. Plaintiffs' notice also explained that their initial summary judgment motion "is fully briefed and ready for a decision by the Court." Doc. 87 at 1. Plaintiffs assert that the purpose of the "supplemental authority is merely to aid the Court in its decision." *Id*. Defendant did not object to plaintiffs' Supplemental Authority. Instead, it filed a Memorandum in Opposition (Doc. 110), admitting and denying plaintiffs' supplemental facts. Defendant's memorandum also advances additional arguments against summary judgment.

Typically, a party moving for summary judgment must support assertions of fact by citing "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also* D. Kan. Rule 56.1(d) (requiring all facts on which a summary judgment motion is based to be "presented by affidavit, declaration under penalty of perjury, and/or relevant pleadings, depositions, answers to interrogatories, and responses to requests for admission."). When a moving party fails to

---

[1] Plaintiffs' Supplemental Authority does not comport with the Court's local rule permitting a party to submit supplemental legal authority. D. Kan. Rule 7.1(f) governs the submission of "pertinent and significant" legal authorities that "come to a party's attention after the party's final brief has been filed." Under Rule 7.1(f), a party may file a letter on the CM/ECF system stating the reason that a supplemental citation is necessary. The letter also must refer to the page of a brief which the party intends to supplement. Because plaintiffs' notice does not comply with these requirements, the Court does not consider it as a notice recognized by our Rule 7.1(f).

support an assertion of fact with such a citation, Fed. R. Civ. P. 56(e) permits the Court to afford the movant "an opportunity to properly support or address the fact."

Here, the Court never issued a Rule 56(e) order. But, having reviewed plaintiffs' initial motion (Doc. 25) and supporting memorandum (Doc. 26), the Court finds that such an order is needed here. The Court thus will construe plaintiffs' Supplemental Authority as a response to an order issued under Rule 56(e). Consistent with this approach, the Court considers plaintiffs' supplemental facts, defendant's response to those facts, and any admissible exhibits supporting or controverting the supplemental facts, below, as part of the summary judgment record that governs this motion. The Court declines, however, to consider the additional legal arguments advanced by either party.[2]

## II.   Plaintiffs' Motion for Summary Judgment

### A.  Uncontroverted Facts

The following facts are uncontroverted or, if controverted, are stated in the light most favorable to defendant, the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

***Plaintiffs' Homeowner's Policy***

Plaintiffs purchased their home in Topeka, Kansas, in 1999. They renovated and expanded the home, adding bedrooms and bathrooms to its east wing in 2000. And, from 2008 through 2012, plaintiffs insured the home and their personal property under a "Homeowners 5" insurance policy issued by defendant (the "Policy").

The Policy included "additional coverage" for damage or loss caused by collapse. The Policy defines a "collapse," as follows:

With respect to this Additional coverage:

---

[2]   Plaintiffs' approach to their summary judgment motion is not the one required by our Court's rules. And it is not a model for other litigants to emulate. The Court's flexibility here largely is derived from the absence of any objection to this unusual approach.

>    1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.
>
>    2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.
>
>    3) A part of a building that is standing is not considered to be in a state of collapse even if it has been separated from another part of the building.
>
>    4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

Doc. 33-1 at 26-27. The Policy also describes, in relevant part, the extent of coverage in the event of a collapse:

>    a. We insure for direct physical loss to covered property involving collapse of a building or part of a building if the collapse was caused by one or more of the following:
>
>    . . . .
>
>    2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse . . . .

Doc. 33-1 at 27.

Section I of the Policy sets out the exceptions to coverage. It provides that defendant does not insure plaintiffs' home against losses caused by "[s]ettling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs, or ceilings . . . ." *Id*. at 31. Section I also describes the exclusions to the Policy. Among those exclusions, the Policy does not cover damage or loss resulting from earth movement:

>    A. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

> . . . .
>
> 2. Earth Movement
>
>   Earth Movement means:
>
>   . . . .
>
>   b. Subsidence or sinkhole; or
>
>   c. Any other earth movement including earth sinking, rising or shifting;
>
>   caused by or resulting from human or animal forces or any act of nature unless direct loss by fire or explosion ensues and then we will pay only for the damage caused by the ensuing cause of loss.

*Id*. at 32. The Policy included, however, additional coverage for damage resulting from earth movement "caused by earthquake including land shock waves or tremors before, during or after a volcanic eruption." *Id*. at 52.

### *The October 30, 2011 Fire*

On October 30, 2011, an electrical outlet caused a fire on the west, load-bearing wall of plaintiffs' kitchen. The outlet was located above the kitchen cooktop, under a brick arch that surrounded the cooktop and a kitchen exhaust hood. Plaintiffs filed a claim for damage caused by the fire with defendant's claim department. Henry Reed, defendant's claim adjuster, inspected the fire damage on November 1, 2011.

### *The December 5, 2011 Claim*

On December 4, 2011, the brick arch surrounding plaintiffs' cooktop and exhaust hood broke apart and fell. The bricks crashed onto the cooktop and kitchen counter, damaging plaintiffs' cabinets, oven, sink, and a kitchen window. The next day, on December 5, 2011, plaintiffs called defendant to file a claim. During that call, plaintiffs asserted that the bricks fell because of a series of earthquakes in Oklahoma on November 5, 2011 and November 6, 2011—

almost one month earlier. Plaintiffs told defendant's claims representative that they had returned home from a trip on November 6, 2011, and discovered that their kitchen countertop had cracked and the garage floor, the kitchen floor, and the master bedroom floor had sunk at least 1.75 inches. Plaintiffs assert that between November 6, 2011, and December 5, 2011, the condition of their home continued to deteriorate. Specifically, Ms. Welton testified as follows:

> Q. All right. Then describe the progression as best you can of damage to your home from the time that you got home [on November 6, 2011] up until the brick arch in the kitchen fell in early December?
>
> A. You know, the home gradually -- it abruptly dropped and then it deteriorated. I mean I had several issues with base boards dropping. I had lights coming out of the ceiling. I had the back splash popping on the back of the kitchen and [torqueing] and you could hear the popping noise.
>
> I had issues in the laundry room with the lights falling. At one point the shades fell out. Dropped out of the -- just completely dropped out of the ceiling in the laundry room.
>
> But everything happened very quickly and very abruptly during a very short time period. Everything had been rock solid for the time that we lived there. We maintained everything. And we didn't leave anything not taken care of.
>
> . . . .
>
> Q. I think you said a few moments ago, there was the abrupt drop and then things progressed. Was the abrupt drop that you were talking about, was that when the earthquake occurred while you were gone?
>
> A. Yes.

Doc. 103-3 at 10-11.

Mr. Reed inspected plaintiffs' home again on January 3, 2012. He noted that: (1) there was extensive cracking of tile, drywall, electrical outlets, and countertops throughout the home; (2) light fixtures had dropped from the ceiling; (3) a portion of the garage floor had shifted; (4) a piece of the foundation at an egress well had fallen; and (5) a gap in the garage roof had formed. Doc. 87 at 10.

Defendant hired Mike Metcalf, P.E. of Metcalf Engineering and Environmental Inspection, Inc. to determine the cause of the damage to plaintiffs' home. Mr. Metcalf inspected the house twice. On March 16, 2012, defendant sent a letter to plaintiffs, informing them that Mr. Metcalf had concluded "that the fundamental and proximate cause of the various distress conditions" at the home was "settlement in the supporting soils." Doc. 26-3 at 4. Defendant also told plaintiffs that Mr. Metcalf had determined that the structural damage was not "caused by or exacerbated by any of the seismic activity that took place in Oklahoma on November 5, 2011 and November 6, 2011." *Id*. Defendant's letter noted that the Policy did not cover property damage caused by settlement or earth movement.

### *Plaintiffs' Preliminary Expert Opinion*

After defendant denied plaintiffs' claim, they retained Gary Van Riessen, P.E. to determine what had caused damage to their home. Mr. Van Riessen inspected plaintiffs' home on June 27, 2012, and reviewed two engineering reports prepared by Mr. Metcalf. On August 10, 2012, Mr. Van Riessen issued a "Preliminary Engineering Observations and Opinions" report (Doc. 33-3). In it, Mr. Van Riessen described his initial conclusions about "the probable mechanics of foundation movements" that, he believed, had caused the kitchen floor and brick arch to fall. Doc. 33-3 at 1.

Mr. Van Riessen found that "[a]pparent historical, minor downward distortion/movement of the foundation footing systems for both the east wing (bedrooms) and west wings (kitchen/dining room/laundry/bathroom areas and southwest quadrant of garage) ha[d] occurred." Doc. 33-3 at 6 (emphasis excluded). Mr. Van Riessen also concluded that a void had formed beneath the concrete slab supporting the kitchen. Specifically, Mr. Van Riessen's report, in relevant part, stated:

> Based on visual observations, the fill underlying the floor slab in the kitchen dining room area is fine-grained sand with a significant void/collapse feature currently underlying the entire kitchen/dining room area. This void collapse feature was likely formed by a combination of several contributing factors:
>
> - The presence of a poorly compacted backfill condition. Backfilling with sand is not typical for most residential applications . . . . Over time, this material will consolidate under its own weight, resulting in the initial formation of some voids beneath the floor slab.
>
> - The addition of water via firefight activities in October 2011, December 2011 and January 2012. The addition of water into poorly compacted sand will result in additional densification and a further reduction in sand volume, leading directly to additional subsidence and void formation.
>
> - Minor vibrations, such as those associated with minor earthquakes. Minor vibration of a loose, wet sand fill will further increase/enhance the densification phenomenon, thereby increasing the total volume of any void/collapse feature ultimately formed below the floor slab. . . .

Doc. 33-3 at 6-7. Mr. Van Riessen also found that someone had attempted to repair damage caused by previous foundation movement near the kitchen floor slab. *See* Doc. 33-3 at 5 (finding evidence "of past movements/distortions . . . by the presence of an in-filled gap containing an expandable foam caulk, with evidence of recent distortion and an apparent increase in the width/magnitude of this separation.").

### *Demolition of Plaintiffs' Home*

Plaintiffs continued to live in their home after filing the December 5, 2011 claim. But, on December 21, 2011, the west, load-bearing wall of the kitchen caught fire again. This time, the fire started at a bathroom electrical outlet near the kitchen. A third fire broke out in the garage on January 18, 2012, causing substantial damage to the property.

Plaintiffs chose to demolish the home during the summer of 2014. On June 25, 2014, Ms. Welton and Allison Sperber, a representative from Mr. Van Riessen's office, watched as workers broke-up and removed the concrete slab under the kitchen floor. Once removed, Ms.

Welton and Ms. Sperber saw that someone had excavated the soil near the basement wall and had backfilled it with 7.5 feet of fine-grain sand. The remaining ground under the slab consisted of a layer of weathered shale on top of a mixture of shale and stiff clay. Ms. Welton and Ms. Sperber confirmed that a void—measuring almost 3.5 feet deep, 4 feet long, and 3 feet wide—had formed in the sand near the basement wall. The two also discovered two corroded and broken cast iron sewer pipes running through the void.

### *Expert Opinions*

Mr. Van Reissen issued a report based on Ms. Sperber's observations. Mr. Van Reissen determined that the void and broken sewer pipes were located under the northwest portion of the kitchen, near the garage door. Mr. Van Reissen's report also states that, contrary to Mr. Metcalf's 2011 opinion, Ms. Sperber found no evidence of "Martin Silty Clay Loam" under the kitchen slab. The report provides, however, that Ms. Sperber found weathered shale and clay below the slab. During his deposition, Mr. Van Reissen testified that weathered shale is "pretty much a clay." Doc. 110-1 at 30. Finally, Mr. Van Reissen concluded that the broken pipes under the kitchen slab had contributed to the formation of the void under the kitchen floor slab. *See* Doc. 92-1 at 11.

Toby Taggart, P.E., a second engineer retained by plaintiffs, reviewed the expert reports prepared by Mr. Van Reissen and Mr. Metcalf. Mr. Taggart opined that the broken sewer pipes had accelerated the natural consolidation of the sand backfill under the kitchen slab. *See* Doc. 109-2 at 10-12.

During his deposition, Mr. Metcalf disagreed with Mr. Van Reissen and Mr. Taggart about the extent that the corroded and broken sewer pipes had contributed to the void under the kitchen slab. Specifically, Mr. Metcalf testified that he does not believe that the sewer pipes

"would completely account for the entirety of the void." Doc. 103-5 at 18. Instead, Mr. Metcalf opined that normal post-construction consolidation of the backfill sand under the slab had caused the void. Mr. Metcalf testified that the vibration of construction equipment used to remove the slab may have increased the size of the void. He also testified that it appeared as though someone may have removed sand from the void during the home's demolition.

### B. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute [about] any material fact" exists and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the Court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245-46 (10th Cir. 2010)). A disputed "issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And an "issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of

evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party meets its initial burden, the non-moving party "'may not rest on its pleadings but [instead] must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248-49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)). To survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. To the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### C. Analysis

Plaintiffs principally contend that they are entitled to summary judgment for two reasons. First, they assert that the summary judgment record demonstrates, as a matter of law, that their kitchen "collapsed," within the meaning of defendant's Policy.[3] Second, plaintiffs contend that

---

[3] Plaintiffs' motion seems to treat the drop of the kitchen floor on November 6, 2011, and the collapse of the brick arch on December 5, 2011, as a single collapse. *See, e.g.*, Doc. 26 at 2 (arguing that

11

defendant has waived its defenses to plaintiffs' claim because defendant concluded that settlement and earth movement (not a collapse) had caused the damage to their home. The Court addresses these two principal issues, in turn, below.

### 1. The uncontroverted facts do not establish that coverage exists as a matter of law.

Plaintiffs contend that summary judgment is appropriate because they assert that they have proven, as a matter of undisputed fact, that their kitchen collapsed. More specifically, plaintiffs argue that they "have met their burden under the policy through engineering evidence provided to [defendant] that their kitchen collapse was caused by the 'hidden and decayed' rusted plumbing under the kitchen floor, which is a covered claim" under the Policy's additional coverage provisions. Doc. 26 at 16-17 (emphasis omitted). Defendant responds, arguing that issues of material fact exist and they make summary judgment improper. Specifically, defendant asserts that the summary judgment record contains facts creating a genuine issue whether a "collapse"—as the Policy uses that term—occurred. Defendant also contends that even if the Court could decide on summary judgment that the requisite "collapse" had occurred, a second issue precludes summary judgment. Namely, defendants argue that a genuine dispute exists about the cause of any collapse and this dispute precludes summary judgment. Defendant thus argues that a jury must decide both questions.

While the second question is a closer call than the first, the Court agrees with defendant. Summary judgment is not appropriate on either issue, and the following discussion explains why.

---

the home collapsed when "the kitchen dropped two (2") to three (3") inches, and thereafter the brick cooktop surround in the kitchen collapsed causing damage."); *Id.* at 16 (asserting that the home "suffered a severe and sudden collapse when its kitchen dropped two . . . to three . . . inches and the brick [cooktop] surround collapse[d] damaging the property."); Doc. 37 at 2 (contending that plaintiffs filed a collapse claim because Ms. Welton informed defendant that the "brick arched valance over cooktops collapsed" (quoting Doc. 37-1 at 6)). The Court thus considers both events as part of a single collapse.

### a. Plaintiffs have failed to demonstrate that a "collapse" occurred.

Defendant's Policy insured plaintiffs for damages caused by a "collapse," and defined that insured event as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." Doc. 33-1 at 26. To prevail on their motion, plaintiffs thus must establish two things. First, they must show that a reasonable jury could draw just one conclusion from the summary judgment facts: that a "collapse" occurred, as the Policy defines that term. Second, they also must show that such a jury only could conclude that plaintiffs' kitchen could not be used for its intended purpose.

On the first question, the analysis begins with understanding what constitutes an insured "collapse." Our Court has held that an unambiguous term in an insurance policy, like terms in other contracts, is given its plain and ordinary meaning. *Gerdes v. Am. Family Mut. Ins. Co.*, 713 F. Supp. 2d 1290, 1296 (D. Kan. 2010) (citing *Am. Media, Inc. v. Home Indem. Co.*, 658 P.2d 1015, 1018 (Kan. 1983)). The defendant's Policy does much of the work, explicitly defining a "collapse" to mean "an abrupt falling down or caving in of a building or any part of a building . . . ." Doc. 33-1 at 26. Our cases likewise have held that "abrupt," when used in a contract of insurance, means a "sudden and unexpected" event. *773, L.L.C. v. Scottsdale Ins. Co.*, No. 11-2103-KHV, 2012 WL 672366, at *7 (D. Kan. Feb. 29, 2012) (citing *Malbco Holdings, LLC v. AMCO Ins. Co.*, 629 F. Supp. 2d 1185, 1195 (D. Or. 2009)).

Recognizing their summary judgment burden, plaintiffs contend that their home "suffered a severe and sudden collapse when the kitchen dropped two . . . to three . . . inches and the brick cooktop surround[ings] collapse[d] damaging the property." Doc. 26 at 16. As noted earlier, plaintiffs seem to view these two events as a single collapse even though a month separated the

13

first event and the second one. *See supra* note 3. But plaintiffs' argument is not faithful to the summary judgment standard because it does not view the facts in the light most favorable to defendant, the nonmovant. Indeed, plaintiffs' argument may not even recite the *plaintiffs'* own view of the facts.

Plaintiffs testified that they returned to their home from an out-of-town trip on November 6, 2011. They found that the kitchen floor had dropped more than an inch, the kitchen counter had cracked, and they had trouble opening a door between the kitchen and the garage. On December 4, 2011, the brick archway above the kitchen's cooktop fell. The next day, plaintiffs filed a claim with defendant, asserting, for the first time, that a collapse had occurred.

Plaintiffs' current motion does not require the Court to decide whether these facts provide a basis for a reasonable jury to find that an insured collapse occurred. Instead, their motion presents the question whether such a jury *only* could find that an insured collapse of plaintiffs' kitchen has occurred. The answer to this question is no. A reasonable jury, after a full presentation of all the facts in the discovery record, might find that two events some 30 days apart are not one "sudden" event. Or such a jury could find that the first event put plaintiffs on notice that the archway might collapse. If so, this would mean the archway's collapse was not unexpected. If a jury made either finding, it would preclude a jury finding that an insured loss had occurred. *773, L.L.C.,* 2012 WL 672366, at *7.

In sum, the summary judgment facts will abide more than one conclusion about a factual dispute that is material to the legal analysis required by the theory of plaintiffs' claim. This precludes summary judgment for plaintiffs.

### b. Plaintiffs have failed to prove that a collapse caused by hidden decay occurred.

Even if plaintiffs could demonstrate that the kitchen had "collapsed," in the sense that the

14

Policy uses that term, summary judgment is unwarranted for a second, independent reason.  Even when an insured collapse occurs, the Policy confines the defendant's coverage for losses resulting from it.  As relevant here, the Policy insures "for direct physical loss to covered property involving collapse . . . if the collapse was caused by . . . [d]ecay that is hidden from view, unless the presence of such decay is known to an insured prior to [the] collapse . . . ."  Doc. 33-1 at 27.  Plaintiffs here argue that they have made the showing this provision requires because their engineering expert—Mr. Van Riessen—opined that the "kitchen collapse was caused by the 'hidden and decayed' rusted plumbing under the kitchen floor."  Doc. 26 at 16 (emphasis omitted).  But this argument both misapprehends their expert's report and departs from the summary judgment standard.

On the former, plaintiffs' own expert opined that movement underneath the kitchen resulted from a combination of factors.  Mr. Van Riessen, their expert, issued a report on July 21, 2015.  It opined, as relevant here:

> Apparent historical, minor downward distortion/movement of the exterior foundation footing systems for both the east wing (bedrooms) and the west wings (kitchen/dining room/laundry/bathroom areas and southwest quadrant of garage) has occurred.  These movements have caused . . . to a limited/reduced percentage, the ceiling/wall cracks, floor cracks and distortions, and other deformations/distortions occurring in the exterior portions of the west addition area.  *The cause of the historical downward settlement is likely due to the natural compression of soils being subjected to vertical compressive forces and/or the shrinkage of foundation support soils due to desiccation (drying).*

Doc. 92-1 at 10 (some emphasis omitted, other emphasis added).  Mr. Van Riessen also concluded that the "void/collapse feature" under the slab "was formed by a combination of several contributing factors," including:  (1) "The presence of a poorly compacted backfill condition"; (2) "[t]he addition of water via firefight activities in October 2011 and January 2012"; (3) "[t]he presence of water emanating from a previously unknown, below-slab, corroded,

15

and impinged/leaking pipe system within the loose sand fill below the northern portion of the kitchen floor slab"; and (4) "[m]inor vibrations, such as those associated with minor earthquakes . . . ." *Id*. at 11. In sum, plaintiffs' own expert identifies a number of causes for the alleged "collapse."

But on this score the theory of plaintiffs' motion again departs from the summary judgment standard. This standard, of course, requires plaintiffs to view the record in the light most favorable to defendant. This favorable viewing includes defendant's expert, Mr. Metcalf, who opined that corroded and broken sewer pipes did not cause the void under the kitchen that caused the kitchen's collapse. To the contrary, Mr. Metcalf opined that this void resulted primarily from normal consolidation of supporting soils. Doc. 162 at 18. A jury hearing Mr. Metcalf's opinions—and plaintiffs make no showing that a jury should not hear his opinions—reasonably might accredit them. And if the jury did so, this would provide a basis for finding that the Policy's Exceptions excluded any loss resulting from this cause from the Policy's coverage. *See* Doc. 33-1 at 31 (excluding from coverage damage caused by "[s]ettling, shrinking, bulging or expansion"). The Court thus denies plaintiffs' motion for this reason as well.[4]

### 2. Defendant has not waived its defenses.

Finally, plaintiffs contend that defendant waived its policy-based affirmative defenses to their claim because it denied coverage based on a determination that settlement and earth movement caused the damage to plaintiffs' kitchen. Generally, "[w]here an insurer bases its

---

[4] Plaintiffs contend that the Policy provides "[']positive assurance of additional coverage in the event the insured demonstrate[s] damage due to collapse caused by hidden decay.[']" Doc. 26 at 7-8 (quoting *Quality Time, Inc. v. W. Bend Mut. Ins. Co.*, No. 12-1008-JTM, 2013 WL 474289, at *13 (D. Kan. Feb. 7, 2013)). But, as discussed above, the uncontroverted facts do not establish that such a collapse occurred. Thus, at the summary judgment stage, plaintiffs have failed to satisfy the threshold inquiry for coverage under *Quality Time*.

16

refusal to pay a loss upon a forfeiture or failure to comply with particular conditions, it cannot thereafter maintain a defense based upon another condition not referred to in such refusal to pay and of which it then had knowledge." *773, L.L.C.*, 2012 WL 672366, at *5 (citing *Pac. Indem. Co. v. Berge*, 473 P.2d 48, 57 (Kan. 1970)).  But, while a "waiver may forestall the forfeiture of an insurance contract, it cannot be invoked to expand the scope of coverage of a policy." *Id.* (citing *Aks v. Southgate Trust Co.*, 844 F. Supp. 650, 659 (D. Kan. 1994)).

Defendant's March 16, 2012 letter to plaintiffs explained that it had decided to deny their claim because settlement or movement in the supporting soils had caused damage to plaintiffs' kitchen.  Defendant's letter noted that the Policy excepts and excludes coverage for damages caused by those conditions.  *See* Doc. 26-3 at 4-6.  As discussed above, the summary judgment record does not establish that hidden decay caused a collapse within the scope of the Policy's additional coverage provisions.  Because plaintiffs have failed to prove that a collapse under the Policy occurred, the Court rejects their assertion that defendant has waived its policy-based defenses to plaintiffs' claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for Summary Judgment (Doc. 25) is denied.

**IT IS SO ORDERED.**

**Dated this 31st day of March, 2016, at Topeka, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**