## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

DR. THOMAS C. WELTON and
MARY E. WELTON,

              **Plaintiffs,**

v.

                                              **Case No. 14-cv-4066-DDC-KGG**

AMCO INSURANCE COMPANY,

              **Defendant.**

## MEMORANDUM AND ORDER

This matter comes before the court on four motions. Defendant AMCO Insurance Company has filed a Motion for Partial Summary Judgment (Doc. 99), asking the court to grant summary judgment against something it refers to as "plaintiffs' structural damage claims." Doc. 100 at 2. Plaintiffs Dr. Thomas C. Welton and Mary E. Welton have filed two motions for summary judgment, one called Motion for Summary Judgment on Collapse Damage Calculation (Doc. 94) and another called Motion for Summary Judgment on Fire/Mold Damage (Doc. 96). Plaintiffs also have filed a Motion to Exclude the Rule 26 Expert Testimony of Dr. Adolfo Matamoros, P.E., Ph.D (Doc. 60). The non-moving party has responded to each motion and all movants have filed replies. For reasons explained below, the court denies each motion.

    **I.**        **Summary Judgment Motions**

        **A.  Legal Standard**

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute [about] any material fact" exists and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the court views the evidence and draws

inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  A disputed "issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  And an "issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party meets its initial burden, the non-moving party "'may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248-49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).  "Unsubstantiated allegations carry no probative weight in summary judgment proceedings."  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)).  To survive summary judgment, the non-moving party's

"evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. To the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### B. Uncontroverted Facts

The following facts are uncontroverted or, where controverted, are stated in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

*Plaintiffs' Homeowner's Policy*

From 2008 through 2012, plaintiffs insured their home and personal property under a Homeowners 5 insurance policy (Policy) issued by defendant. The Policy included additional coverage for damage or loss caused by collapse. The Policy defined a collapse as follows:

1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

3) A part of a building that is standing is not considered to be in a state of collapse even if it has been separated from another part of the building.

4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

Doc. 100-7 at 25-26. The Policy also described, in relevant part, the extent of coverage if a collapse occurred:

    a.  We insure for direct physical loss to covered property involving collapse of a building or part of a building if the collapse was caused by one or more of the following:

    . . . .

        2)  Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;

        . . . .

        4)  Weight of contents, equipment, animals or people . . . .

*Id*. at 26.

Section 1 of the Policy set out the exclusions to plaintiffs' insurance coverage.

Specifically, it provided that defendant did not insure plaintiffs' home against loss caused by:

    d.  Constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within:

        1)  A plumbing, heating, air conditioning or automatic fire protective sprinkler system or a household appliance on the "residence premises"; or

        2)  A storm drain or water, steam or sewer pipes off the "residence premises".

*Id*. at 14, 29.  Nor did the Policy cover loss resulting from "[s]ettling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs, or ceilings."  *Id*. at 30.  But the Policy carved out an exception to this particular exclusion, providing:

Unless the loss is otherwise excluded, we cover loss to property under Coverage A, B or C resulting from an accidental discharge or overflow of water or steam from within a:

Plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises" . . . . This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises," but only when necessary to repair the system or appliance . . . .

*Id*. at 30.

4

Section 1 of the Policy also outlined the insured's duties after loss.  When the insured sustained

loss to covered property, the insured seeking coverage or its representative had a duty to:

> 4. Protect the property from further damage.  If repairs to the property are
> required, you must:
>
>> a.  Make reasonable and necessary repairs to protect the property; and
>>
>> b.  Keep an accurate record of repair expenses . . .

*Id.* at 33.

### The October 30, 2011 Fire

On October 30, 2011, an electrical outlet caused a fire on the west, load-bearing wall of

plaintiffs' kitchen.  The outlet was located above the kitchen cooktop, under a brick arch

surrounding the cooktop and a kitchen exhaust hood.  Plaintiffs filed a claim for this damage

with defendant's claim department.  Henry Reed, defendant's claim adjuster, inspected the fire

damage on November 1, 2011.

### The December 5, 2011 Claim

On December 4, 2011, the brick arch surrounding plaintiffs' cooktop and exhaust hood

broke apart and fell.  The bricks crashed onto the cooktop and kitchen counter, damaging

plaintiffs' cabinets, oven, sink, and a kitchen window.  The next day, December 5, 2011,

plaintiffs filed a claim with defendant.  Plaintiffs asserted that the bricks fell because of a series

of earthquakes centered in Oklahoma.  These earthquakes had occurred nearly a month earlier,

on November 5, 2011, and November 6, 2011.  Plaintiffs assert that they returned home from a

trip on November 6, 2011, and discovered that the floors of their garage and kitchen had dropped

at least 1.75 inches.  Plaintiffs also assert that between November 6, 2011 and December 5,

2011, the condition of their home continued to deteriorate.  Ms. Welton testified that she

prepared a timeline describing the ongoing damage at the home.  As relevant here, that timeline

describes the damage she observed between November 5, 2011, and December 5, 2011, as

follows:

- Nov. 5 – Nov. 6, 2011 – A 2.7 earthquake occurred in the area.  After shocks were felt by many individuals in the area.  The kitchen floor dropped by approx. 1 ¾ inches.  The garage floor dropped 1 inch.

- Nov. 28, 2011 – The tile floor in the kitchen erupts.  The tile backsplash in the kitchen starts to crack and [shift] more, specifically to the left side of the sink.

- Dec. 4, 2011 – Tile in the kitchen pops out of place and shifts.  Movement can be heard in the brick overhang above the stovetops.  The brick overhang then collapses smashing the cabinets and window, as well as punching out the sink and garbage disposal.  Furthermore, the falling brick smashes the top of the ovens and countertops.

Doc. 100-1 at 1.

Defendant hired Mike Metcalf, P.E. of Metcalf Engineering and Environmental

Inspection, Inc. to examine the damage to plaintiffs' home.  Mr. Metcalf inspected the house

twice.  And, on March 16, 2012, defendant sent a letter to plaintiffs, informing them that Mr.

Metcalf had concluded "that the fundamental and proximate cause of the various distress

conditions" at the home was "settlement in the supporting soils."  Doc. 26-3 at 4.  Defendant also

informed plaintiffs that Mr. Metcalf had determined that the structural damage was not "caused

by or exacerbated by any of the seismic activity that took place in Oklahoma on November 5,

2011 and November 6, 2011."  *Id*.  Defendant's letter noted that the Policy did not cover

property damage caused by settlement or earth movement.  This letter also included the

following reservation of rights:

By naming the specific grounds for this disclaimer of coverage, we do not waive any of our rights or any of the other provisions and conditions of the policy of insurance and specifically reserve all of our rights and remedies under this policy and under the [statutes] of common law.

6

*Id*. at 6.

Plaintiffs continued to live in their home after filing the December 5, 2011 claim.  On December 21, 2011, the west, load-bearing wall of the kitchen caught fire again.  This time, the fire started by an electrical outlet in a nearby bathroom.

### The January 18, 2012 Fire

A third fire broke out in the garage on January 18, 2012, causing substantial damage to the property.  Plaintiffs moved out of the house sometime after this last fire.

### Fire/Mold Damage

After the January 18, 2012 fire, defendant investigated the fire for seven weeks.  During the investigation, fire, smoke, and water damage manifested themselves inside plaintiffs' home. Defendant's personal property claims adjuster, Heather Schulte, hired and paid for two independent smoke, fire, and water mitigation companies in an attempt to save plaintiffs' personal property.  Defendant did not hire a mitigation company to address the smoke and water damage to the structure of the home.  Matthew Ledell, defendant's representative, visited the plaintiffs' home on January 19, 2012.   One day later, Mr. Ledell sent plaintiffs a letter advising them to protect their property against further damage.  Plaintiffs chose to demolish the home during the summer of 2014.

### Plaintiffs' Experts

Plaintiffs have retained a number of engineering and construction experts to examine the damage to their home and opine about what caused it.  Among these experts, plaintiffs hired Toby Taggart, a structural engineer.  Mr. Taggart inspected plaintiffs' home in "late 2011 . . . after the brick surround around the stove had fallen and had been cleaned up."  Doc. 100-9 at 2. He testified that when he visited the home, no part of the home had caved in and no significant

structural collapse had occurred.  Mr. Taggart also testified that he did not notice a significant slope in the kitchen floor.  As a structural engineer, Mr. Taggart testified that he was obligated to tell plaintiffs if he believed the conditions at their home left it unsafe to occupy.  But Mr. Taggart did not give plaintiffs such a warning because he did not think the home was unsafe.

Plaintiffs also hired Jerry Bascombe of Air & Mold Assessment, L.L.C. to evaluate mold growth in their home.  Mr. Bascombe reported that there was visible mold in 13 locations inside plaintiffs' home.  Mr. Bascombe also reported that any steps taken to prevent the mold required mitigating water damage to the home within 24–48 hours after the fire department's efforts on January 18, 2012.

### C.  Defendant's Motion for Partial Summary Judgment (Doc. 99)

Defendant asks the court to grant summary judgment against plaintiffs' structural damage claims.  Doc. 99.  Those claims—which plaintiffs refer to as a single "collapse claim"—include all damage caused by "floor movement, wall movement, settlement of the floors, and the collapse of a brick arch over the stove and countertops on the east side of [plaintiffs'] kitchen." Doc. 100 at 1.  Defendant claims that plaintiffs have failed to show any genuine issues of material fact about whether coverage exists.  Defendant makes two principle arguments to support its motion.  First, defendant claims that the undisputed facts fail to establish a collapse under the Policy's definition.  Second, defendant contends that the Policy expressly excludes coverage for plaintiffs' remaining structural damage claims.  For reasons explained below, the court denies defendant's motion.

### 1.  Whether Plaintiffs' Home Collapsed According to the Policy

Defendant's first summary judgment theory asserts that plaintiffs have not shown that their home sustained a collapse within the Policy's definition of that term.  "The interpretation of

an insurance policy, like other contracts, is a question of law." *Hartford Fire Ins. Co. v. Vita Craft Corp.*, 911 F. Supp. 2d 1164, 1175 (D. Kan. 2012) (*citing AMCO Ins. Co. v. Beck*, 929 P.2d 162, 165 (Kan. 1996)).  "[A] federal court sitting in diversity must apply the choice of law provisions of the forum state in which it is sitting." *Ace Property & Cas. Ins. Co. v. Superior Boiler Works, Inc.*, 504 F. Supp. 2d 1154, 1158 (D. Kan. 2007); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  In Kansas, the choice of which state's law governs contract construction depends on where the contract is made.  *Simms v. Metro. Life Ins. Co.*, 685 P.2d 321, 324 (Kan. Ct. App. 1984).  Here, neither defendant nor plaintiffs address the choice of law issue.  But, both defendant's Motion and plaintiffs' Response cite Kansas law for interpreting the Policy.  *See* Docs. 100, 106.  Plaintiffs live in Kansas and the home defendant insured was located in Kansas.  Given the parties' apparent agreement that Kansas law applies, the court treats the contract as if it was made in Kansas and thus applies Kansas law.

    In Kansas, "[c]ourts give the terms in an insurance policy their plain and ordinary meaning unless the parties have expressed a contrary intent." *Hartford*, 911 F. Supp. at 1176 (*citing Pink Cadillac Bar & Grill, Inc. v. U.S. Fid. & Guar. Co.*, 925 P.2d 452, 465 (Kan. Ct. App. 1996)).  Whether a term is ambiguous turns on "what a reasonably prudent insured would understand the language to mean." *Id.* (*citing Pink Cadillac Bar & Grill, Inc.*, 925 P.2d at 465).

    To be ambiguous, "a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Id.* (citing *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.,* 810 P.2d 283, 285 (Kan. 1991)).  Where terms have uncertain meaning in a contract of insurance, the court accepts "the construction most favorable to the insured." *Id.*  (citing *Farm Bureau Mut. Ins. Co. v. Old*

*Hickory Cas. Ins. Co.,* 810 P.2d 283, 285 (Kan. 1991)).  If the terms are not ambiguous, the court must enforce the Policy according to its terms.  *Id.*

Defendant contends that plaintiffs have failed to meet the Policy's definition of collapse because "no part of the home had fallen down or caved in to the extent that the home was uninhabitable."  Doc. 100 at 17.  Specifically, defendant notes that the entire house, "including all walls and all ceilings, floors, doors, etc., were still standing and in place."  *Id.*  Defendant asserts that plaintiffs' evidence reveals no more than settling floors, cracked walls, and cracked ceilings; so, defendant says no part of the home collapsed under the Policy's definition.

Plaintiffs contend that the house collapsed because there was a "significant drop in the kitchen floor" and "falling bricks which destroyed the kitchen rendering the kitchen unusable for its intended purpose."  Doc. 106 at 26.

Section 1 of the Policy expressly defines collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose."  Doc. 100-7.  The Policy also provides that a building or any part of it "is not considered to be in a state of collapse" if it is still standing, even if it "is in danger of falling down or caving in . . . separated from another part of the building," or displays "evidence of cracking, bulging, sagging, leaning, settling, shrinkage or expansion."  *Id.* To prevail on its Motion for Summary Judgment, defendant thus must show that no reasonable jury could find that an abrupt falling down or caving in of plaintiffs' home prevented plaintiffs from occupying it, or any part of it, for its current intended purpose.

Defendant contends that the uncontroverted facts establish that no such collapse occurred. To support this proposition, defendant advances two arguments.  First, plaintiffs do not meet the definition of collapse because plaintiffs' home did not suffer an "abrupt falling down or caving

in." Second, plaintiffs do not meet the definition of collapse because they have not shown that they could not occupy the home after the earthquake. Doc. 100 at 17. Contrary to defendant's argument, genuine issues of fact exist, they are material ones, and they preclude granting defendant's Motion.

### i. "Abrupt falling down or caving in"

Defendant's first argument rests on the fact that plaintiffs' kitchen revealed signs of "sagging . . . cracking of walls, settling, shrinkage and expansion," none of which are covered under the Policy's definition of collapse. Doc. 100 at 18. Indeed, the Policy specifically excludes "evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion" from the collapse definition if the building is still standing. Doc. 100-7. Defendant also points to testimony from plaintiffs' expert witness Toby Taggart who visited plaintiffs' home in late December 2011 and found "[n]one of the structure" of the home had fallen. Doc. 100 at 19.

But, Mr. Taggart also noted that the "brick surround" in the kitchen had fallen. Doc. 100-9 at 30. Plaintiffs characterize the drop in the kitchen floor and falling brick arch as a single collapse, though they occurred nearly 30 days apart. *See* Doc. 106 at 26; *see also* 100-1 (plaintiffs' timeline).

Viewing the facts in the light most favorable to plaintiffs, the non-moving party, a reasonable jury could find that a drop in the kitchen floor and eventual falling of bricks in that room qualifies as an abrupt falling down or caving in, even if they occurred over a span of 30 days. Our court has held that abrupt, when used in an insurance contract, means a "sudden and unexpected event." *773, LLC v. Scottsdale Ins. Co.*, No. 11-2103-KHV, 2012 WL 672366, at *7 (D. Kan. Feb. 29, 2012) (citing *Malbco Holdings, LLC v. AMCO Ins. Co.*, 629 F. Supp. 2d 1185,

1195 (D. Or. 2009)).  Courts have characterized cave-ins and fall-downs over various time periods as abrupt.  *See id.*  (noting that a reasonable jury could find that a building collapse was sudden and unexpected when the building was barricaded in case of collapse ten days before the actual collapse occurred); *see also Malbco Holdings*, 629 F. Supp. 2d 1185 at 1196–97 (noting that a reasonable jury could find abrupt, sudden failure despite gradual rot of building materials and could find collapse if at least part of the building fell down).  Defendant has failed to show that no reasonable jury could find that the drop of the kitchen floor and eventual falling brick arch qualifies as "an abrupt falling down or caving in."

### ii.  "Occupied for its intended purpose"

Defendant's second argument turns on the second half of the Policy's definition of the term "collapse."  A collapse occurs, according to this definition, when an "abrupt falling down" prevents the insured building—or part of it—from being "occupied for its current intended purpose."  Doc. 100-7 at 25–26.  Defendant's Motion argues that plaintiffs have failed to adduce evidence that they could not occupy their home after the December collapse.  It's even worse than that, defendant says, plaintiffs have admitted that they continued to live in their home for more than one month after the purported collapse occurred.

The problem with defendant's argument is that it stops reading the Policy too quickly.  The full definition of collapse permits plaintiffs to recover when the home "or part of" it "cannot be occupied for its current intended purpose."  A reasonable jury could conclude that the intended purpose of a kitchen includes preparing food, cooking it, using the appliances in that room, and washing dishes.  So the question is, have plaintiffs adduced admissible evidence that a collapse kept them from using their kitchen for these purposes?

12

Plaintiffs' response to this portion of defendant's motion is limited.  But, limited or not, it establishes that defendant's expert, Michael Metcalf, provided admissible evidence that could support a jury finding that plaintiffs could not occupy their kitchen for its intended purpose.  For instance, plaintiffs' counsel questioned Mr. Metcalf about a series of photographs.  Although plaintiffs never identify the photographs, the deposition transcripts indicate that they show the state of plaintiffs' kitchen immediately after the brick arch above their cooktop fell.  The transcript also reveals that plaintiffs could not use the cooktop or sink in their kitchen.  For example, Mr. Metcalf testified:

> Q.    Okay.  Now let's move forward to - - well, before we move forward to January 25th, 2012, I was going to ask you, in your opinion on Metcalf Exhibit 7, reviewing those photographs, could the Weltons' kitchen be used for its intended purpose?
>
> MR. KARAIM: Object.   It's vague, ambiguous, overbroad, lacks foundation.
>
> A.    Well, I don't know exactly what the Weltons did in their kitchen, but certain portions of it are not - - do not appear to be usable.
>
> BY MR. BERRY:
>
> Q.    And would you agree that those portions include the cooktop?
>
> MR. KARAIM:        Same objections.
>
> A.    Yes.  The cooktop appears to be encumbered by brick debris.
>
> BY MR. BERRY:
>
> Q.    If you move towards the end . . . .   It was a picture of the sink. Does the kitchen sink appear to be usable for its intended purpose?
>
> MR. KARAIM:        Same objections.
>
> A.    Well, it looks like there's a chance it would leak.
>
> . . . .

> Q.     When you say there's a good chance it could leak, could you be a little bit more specific?
>
> A.     Well - -
>
> MR. KARAIM:     Same objections.
>
> THE WITNESS:     It appears the - - the basin has been separated from the countertop and left a significant space below the countertop.

Doc. 109-4 at 5-6.

This evidence carries plaintiffs' summary judgment burden.  It furnishes a basis for a reasonable jury to find that plaintiffs could not occupy a part of their insured home—the kitchen—for its intended purpose once the bricks fell and damaged part of that room.  In short, defendant's argument tries to prune the Policy's definition of the controlling contract term and therby renders part of the parties' contract meaningless.  This approach is unfaithful to Kansas contract law.  *See, e.g., Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. Bottling Group, LLC*, No. 07-2315, 2009 WL 873020, at *6 (D. Kan. Mar. 30, 2009) (applying Kansas law) (when "faced with a choice of finding a contract term meaningless or meaningful, a court will opt for the latter.").

Defendant's argument is unpersuasive.  The court denies the part of defendant's summary judgment motion seeking a summary judgment holding that no collapse occurred.[1]

## 2.   Whether Remaining Structural Claims Are Covered

Defendant next moves for summary judgment against plaintiffs' structural damage claims.  It contends that plaintiffs' home did not collapse and plaintiffs have failed to show a genuine issue of material fact whether the Policy covers the remaining structural damage to the

---

[1] In its Reply, defendant provides a survey of the way different states have interpreted the definition of collapse in an insurance policy.  Doc. 117 at 23–28.  But, many of the cases defendant cites dealt with insurance policies that defined collapse differently than the Policy at issue here (*i.e.*, without the language "for its current intended purpose").  And, the Policy's language, like the words in any contract, is controlling.  Also, none of defendant's cases consider the meaning of "intended purpose."

home.  Trying to support this motion, defendant asserts that undisputed facts show that the damage to plaintiffs' home was caused by settlement, faulty construction, earth movement, and water from both firefighting efforts and a leaking drain pipe.  Defendant correctly points out that none of these causes are covered under the Policy's plain language.  Doc. 100 at 14–15.

Unfortunately from defendant's perspective, the Policy language covers damage caused by collapse just as explicitly as it excludes damage caused by settlement, faulty construction, earth movement and certain water damage.  So, to accept defendant's argument would require the court to decide that the falling brick arch and kitchen settlement are separate events covered separately under the Policy.  As discussed above, a reasonable jury could find that the kitchen floor settlement and falling brick arch together qualified as a single collapse, not separate events invoking separate Policy terms.  This possibility prevents defendant from establishing that no genuine issues of material fact exist.  The court denies this aspect of defendant's Motion for Partial Summary Judgment.

### D.  Plaintiffs' Motion for Summary Judgment on Fire/Mold Damages (Doc. 96)

Plaintiffs' summary judgment motion seeks partial summary judgment on two discrete issues.  First, plaintiffs' motion seeks a summary judgment order holding that defendant has breached the insurance contract's duty of good faith and fair dealing because it failed to mitigate water damage to plaintiffs' home.  Second, plaintiffs claim that defendant, by failing to perform its own estimate of plaintiffs' fire/mold damage claim, has waived its right to contest the amount of loss.  The next two subsections explain why the court denies both aspects of plaintiffs' motion.

### 1.   Breach of Duty of Good Faith and Fair Dealing

The first aspect of plaintiffs' motion arises from defendant's seven week investigation of the January 18, 2012 fire.  Defendant hired two mitigation contractors to protect plaintiffs' personal property, but, according to plaintiffs, did nothing to mitigate damage to the interior of the home.  Plaintiffs' argument principally rests on an expert report prepared by Air & Mold Assessment.  This report states that water damage to the interior of a home must be mitigated within 24 to 48 hours to prevent further damage.  Plaintiffs assert that defendant failed to provide the full benefits of the Policy by not mitigating smoke and water damage to the interior of the home at any time during the seven weeks following the fire, and thus defendant breached the duty of good faith and fair dealing.

In response, defendant asserts that regardless of whether water damage should be mitigated within 24 to 48 hours, defendant had no obligation to mitigate damage to the interior of the home.  Defendant points to Section 1 of the Policy, which provides:

> In case of a loss to covered property, these duties must be performed either by you, an 'insured' seeking coverage, or a representative of either:
>
> . . .
>
> 4.  Protect the property from further damage.  If repairs to the property are required, you must:
>
>     a.  Make reasonable and necessary repairs to protect the property; and
>
>     b.  Keep an accurate record of repair expenses.

Defendant also refers to a letter sent from its representative, Mr. Ledell, to plaintiffs. [2]  Doc. 110-10.  The letter, dated one day after the last fire at plaintiffs' home, advises plaintiffs of their

---

[2] In their Reply, plaintiffs specifically deny that Mr. Ledell gave them the January 19, 2012 letter until March 8, 2012, when Mr. Ledell dropped the package off at plaintiffs' office.  *See* Doc. 115 at 9 n.1. However, for summary judgment purposes, the court takes the facts in the light most favorable to the nonmoving party.  On the fire/mold damage issue, defendant is the nonmoving party.

obligation to protect their property from further damage.  *Id.*  Finally, defendant points to a payment it made to plaintiffs toward the cost of their home's contents, the property damage, and additional living expenses.  Doc. 112-3.

"Although Kansas courts have not specifically addressed whether a party may bring a contract-based claim for the breach of duty of good faith and fair dealing in the context of a first-party insurance claim, they have held that such duty applies in every contract."  *H&L Assocs. of Kan. City, LLC v. Midwestern Indem. Co.*, No. 12-2713-EFM, 2013 WL 3854484, at *3 (D. Kan. July 25, 2013) (citing *Aves ex rel. Aves v. Shah*, 906 P.2d 642, 648 (Kan. 1995); *Howard v. Ferrellgas Partners, L.P.*, No. 10-2555-JTM, 2011 WL 3299689, at *6 (D. Kan. Aug. 1, 2011)). Consistent with these cases, the court reasons that the duty of good faith and fair dealing applies to contracts of insurance.  But prevailing on this legal principle is just one of many burdens that plaintiffs must carry to prevail on this claim.

The next step is where plaintiffs' Motion flounders.  Plaintiffs theorize defendant breached its good faith duty by directing plaintiffs to "stay out" and "not disturb" the parts of the home sustaining significant fire, smoke, and water damage.  This, plaintiffs claim, made it impossible for them to perform any mitigation duty imposed on them by the contract.  Doc. 100-7.  The problem with this theory is that they never have established defendant's purported conduct is an uncontroverted fact.  Indeed, plaintiffs never even made this assertion until they filed their Reply.  *See* Doc. 115 at 7.

Since at least 1986, summary judgment proponents cannot rely on allegations to provide factual support for a summary judgment motion.  This aspect of plaintiffs' motion is unpersuasive and the court denies it.

## 2.   Waiver and Estoppel

The second prong of plaintiffs' summary judgment motion asserts that defendant "waived" any right to challenge the fire/mold damages claimed by plaintiffs because defendant did not prepare a loss estimate of its own.  Plaintiffs' argument misunderstands how summary judgment works.  It also misapprehends the waiver doctrine.

On the former, plaintiffs, as proponents of a damage claim seeking some $1 million, bear the burden to persuade the factfinder that the amount of their claim truly is the value of the loss they claim.  Trying to meet this burden, plaintiffs have retained a putative expert witness who, it seems, has valued their loss and will testify about his opinions on this for trial.  In contrast, defendant, as defending parties often do, chose not to retain (or at least chose not to disclose) an expert witness.  Indeed, for strategic reasons, defendant may even choose not to address plaintiffs' damage evidence at trial.  Or, perhaps, defendant will choose to attack this damage claim by vigorously cross-examining plaintiffs' expert.  But a defendant's choice not to disclose a damage expert does not mean that plaintiffs are spared their burden of proof at trial.  *See Nash Finch Co. v. Caspar*, 813 F. Supp. 1497, 1499 (D. Kan. 1993) (plaintiff has the burden to show each element of the breach of contract action); *see also Sprint Nextel Corp. v. Middle Man, Inc.*, No. 12-2159-JTM, 2014 WL 6977931, *4 (D. Kan. Dec. 9, 2014) ("[o]ne who *claims damages* on account of a breach of contract . . . must also show with reasonable certainty the amount of damage suffered as a result.")  (emphasis added).  Plaintiffs cannot carry their burden of proof on the damage element of their contract claim by showing that defendant has not disclosed a damage expert.

Plaintiffs' motion also contends that defendant "waived" all right to challenge the loss calculations performed by plaintiffs' expert.  Under Kansas law, waiver is an intentional and

voluntary relinquishment of a known right when a party is in full possession of the facts. *Lyons ex rel. Lawing v. Holder*, 163 P.3d 343, 349 (Kan. Ct. App. 2007). As already discussed, the substantive law governing plaintiffs' fire/mold damage claim does not burden defendant to name a damage expert, or, if it doesn't, to forgo the right to contest the damages claimed by plaintiffs.

Tellingly, plaintiffs never cite a single case for the proposition that lies at the heart of their argument: that defendant waived the right to challenge their damages because it retained no damage expert of its own. To no one's surprise, the court's research has not located a single case that endorses plaintiffs' position.

The plaintiffs' motion on this issue (Doc. 96) is unfounded. It is denied.

### E.  Plaintiffs' Motion for Summary Judgment on Collapse Damages (Doc. 94)

Plaintiffs next ask the court to grant summary judgment on the amount of plaintiffs' collapse damages. Plaintiffs claim their damages total $546,217.19. Plaintiffs again advance two theories to support their motion. First, they say, defendant erred in denying plaintiffs' claim based on policy exclusions. Second, plaintiffs claim that defendant, by not creating an estimate of plaintiffs' claim, waived and is estopped from "asserting that [p]laintiffs' damages are anything less than $546,217.19." Doc. 95 at 2. Plaintiffs thus request the court enter judgment as a matter of law against defendant in the amount of $546,217.19, plus attorney's fees.

Once again, plaintiffs do not cite, and the court does not find, any authority for the idea that a defendant waives the right to contest plaintiffs' damages by failing to nominate its own expert. [3] This motion simply recycles the same argument rejected in part D, above. The court thus denies plaintiffs' Motion for Summary Judgment on Collapse Damages.

---

[3] Plaintiffs' Response (Doc. 107) to defendant's Motion and their own Motion for Summary Judgment on fire/mold and collapse damages (Docs. 95 and 97) are not templates for other litigants to follow. All refer to, and rely heavily upon, arguments set out in the Motion for Summary Judgment (Doc. 25) that

II.      **Plaintiffs' Motion to Exclude Dr. Adolfo Matamoros, P.E., Ph.D (Doc. 60)**

Plaintiffs assert six broad arguments for excluding defendant's expert, Dr. Matamoros.

These arguments are properly distilled down to three:  (1) the court should exclude Dr.

Matamoros's testimony because defendant violated Fed. R. Civ. P. 26(a)(2) when it did not

produce Dr. Matamoros's 2014 draft report; (2) defendant's use of Dr. Matamoros's testimony is

barred by waiver and estoppel; and (3) the court should exclude Dr. Matamoros's testimony as a

matter of equity under Fed. R. Evid. 702.  The court addresses each argument, in turn, in the final

three sections of this order.

### A.  Fed. R. Civ. P. 26(a)(2) and 37(c)(1)

Plaintiffs assert defendant violated Fed. R. Civ. P. 26(a)(2) by failing to disclose a report

that Dr. Matamoros prepared for defendant's counsel in 2014.  Rule 26(a)(2) provides:  "a party

must disclose to the other parties the identity of any witness it may use at trial to present

evidence under Federal Rule of Evidence 702, 703, or 705."  Additionally, witnesses retained or

"specially employed to provide expert testimony in the case" must provide a written report.  Fed.

R. Civ. P. 26(a)(2)(B).  "A party must make these disclosures" at the time the court orders.  Fed.

R. Civ. P. 26(a)(2)(D).  "If a party fails to provide information or identify a witness as required

---

plaintiffs filed on March 6, 2015.  There, plaintiffs asserted that a collapse of their home had occurred and
asked the court to grant summary judgment in their favor on that issue.  Plaintiffs also argued that
defendant had waived any Policy-based defenses to plaintiffs' claims that defendant did not mention
expressly in a March 16, 2012 letter denying plaintiffs' original insurance claim.  But, on March 31, 2016,
the court denied both of plaintiffs' arguments and their summary judgment motion. *See* Doc. 119.  Even
so, plaintiffs' Response seems to assume that they already have proved that their kitchen collapsed, and
they spend much of their January 29, 2016 motions arguing in favor of their March 6, 2015 motion. *See*
Doc. 107 at 23-24 (arguing that plaintiffs "are entitled to summary judgment on their breach of contract
claim regarding 'Collapse'" and that defendant "failed to come forward with any other document,
affidavit, letter of denial, or evidence of denial of [p]laintiffs['] 'Collapse'").  The court again denies
summary judgment on those issues.

by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence"
at trial, "unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).

But though expert witnesses must provide a written report under Rule 26(a)(2)(B), drafts
of the expert's report are protected work-product.  Rule 26(b)(4)(B) says so explicitly:  "Rules
26(b)(3)(A) and (B) protect drafts of any report or disclosure required under Rule 26(a)(2),
regardless of the form the draft is recorded."  Rule 26(b)(3)(A) states that "[o]rdinarily, a party
may not discover documents and tangible things that are prepared in anticipation of litigation or
for trial by or for another party or its representative (including the other party's attorney,
consultant, surety, indemnitor, insurer, or agent)."

In February 2014, defendant's counsel retained Dr. Matamoros to opine whether an
earthquake in Oklahoma caused the damage to plaintiffs' home.  Dr. Matamoros prepared a
report dated May 22, 2014 (The May 2014 report).  Plaintiffs filed this lawsuit on June 10, 2014,
and on March 3, 2015, defendant provided a privilege log to plaintiffs' counsel.  The privilege
log identified the May 2014 report as "the report of a consulting expert not subject to
production."  Doc. 65-7.  On September 14, 2015, defendant disclosed its expert witnesses.  The
first witness identified was Dr. Matamoros.  Defendant provided plaintiffs with a copy of Dr.
Matamoros's Rule 26 expert report sometime after that Rule 26 disclosure.  When defendant
provided a copy of Dr. Matamoros's Rule 26 report, defendant complied with all of its Rule 26
expert witness obligations.

On November 5, 2015, defendant sent plaintiffs a copy of Dr. Matamoros's May 2014
report in an email attachment.  Defendant stated in the email it still believed the May 2014 report
was privileged even though it had decided to give it to plaintiffs.  Doc. 84-8.  Plaintiffs deposed

Dr. Matamoros some six weeks later on December 14, 2015.  Plaintiffs never assert that

defendant prevented them from asking about the 2014 draft.

The May 2014 report was arguably protected work-product until defendant disclosed it in

November 2015, choosing to waive any work-product protection.  *See United States v. Ary*, 518

F.3d 775, 783 (10th Cir. 2008) ("[c]ourts will imply waiver when a party claiming the protection

has voluntarily disclosed work product to a party not covered by the work-product doctrine.").

Choosing to provide plaintiffs with the May 2014 report does not affect whether Dr.

Matamoros's testimony is admissible because Rule 26 never obligated defendant to send the

May 2014 report to plaintiffs.  Defendant did not violate Rule 26(a)(2) and thus Rule 37(c)(1)

provides no basis for excluding Dr. Matamoros's testimony.  And more pragmatically, plaintiffs

had the May 2014 report long before they took Dr. Matamoros's deposition.

### B.  Waiver and Estoppel

Plaintiffs next assert that defendant, by not producing Dr. Matamoros's May 2014 report,

waived and is estopped from asserting any of Dr. Matamoros's opinions as a defense.  Plaintiffs

note that "[w]here an insurer bases its refusal to pay a loss upon a forfeiture or failure to comply

with [a] particular condition it cannot thereafter maintain a defense based upon another condition

not referred to in such refusal to pay."  Doc. 61 at 18 (citing *N. River Ins. Co. v. Huff*, 628 F.

Supp. 1129, 1134 (D. Kan. 1985)).  As the court understands it, plaintiffs assert that because

defendant did not rely on Dr. Matamoros's May 2014 report when it denied plaintiffs' claim,

defendant has waived and is estopped from using any of Dr. Matamoros's opinions in its

defense.

Whether Dr. Matamoros may testify as an expert witness and whether defendant has

waived any claim or defense are separate issues.  Plaintiffs have made no legal argument for why

defendant has waived, or should be estopped from using Dr. Matamoros's expert testimony. Plaintiffs do not cite, and the court does not find, any authority for the proposition that when an insurance company denies coverage it must also include names and opinions of expert witnesses it will use to support its denial if the dispute goes to trial.  Though an insurer cannot base its refusal to pay a loss upon one condition and thereafter maintain a defense based upon another condition, no legal authority suggests that an insurer is precluded from denying coverage on one basis and later retaining an expert witness to testify to support the basis that the insurer invoked.

And finally, though waiver of a defense is a separate issue, there is no reason to believe defendant has waived any right to assert the defense it asserts in this case.  Defendant's reason for denying plaintiffs' claim in the March 16, 2012 denial letter was that settlement had caused the damage.  *See* Doc. 64-2.  Dr. Matamoros's Rule 26 expert report similarly concludes that settlement caused the damage to the house.  *See* Doc. 62-1.  Neither the denial letter nor Dr. Matamoros's Rule 26 expert report asserts "earthquake" or "earth movement" as a defense to plaintiffs' claims.  Both the denial letter and the Rule 26 expert report rely on settlement. Neither waiver nor estoppel provides grounds for excluding Dr. Matamoros's testimony.

### C.  Fed. R. Evid. 702

Finally, plaintiffs assert that the court should exclude Dr. Matamoros's testimony as a matter of equity.  Under Fed. R. Evid. 702, the court has a "gatekeeping obligation" to determine the admissibility of expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  In performing this gatekeeping role, the court has broad discretion when deciding whether to admit expert testimony.  *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1498 (10th Cir. 1996).

The court must apply a two-part test to determine the admissibility of expert testimony. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013).  First, the court must determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion."  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702).  Second, the court  "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'"  *Id.* (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006) (further citations omitted)).

Plaintiffs' motion does not invoke the court's gatekeeping obligation for the reasons typically recognized under Rule 702.  Instead, plaintiffs assert that defendant has used the attorney client privilege to "hide . . . [an] expert report and opinions" under the attorney client privilege.  Doc. 61 at 15.  And so, plaintiffs argue, it is "fundamentally unfair" to permit defendant to present Dr. Matamoros at trial.  Doc. 61 at 15.  But, plaintiffs' argument misapprehends how the expert rules work.

Once defendant learned that plaintiffs claimed that their home had sustained damage for a reason allegedly covered by defendant's insurance policy, defendant had a right to assemble information that it might use to defend plaintiffs' anticipated claims.  Also, Rule 26(b)(3)(A) explicitly gave defendant the right to shield documents (or other things) that defendant elected to prepare because it anticipated litigation that, ultimately, plaintiffs later filed.  Defendant did more than what the rules allowed it to do—withhold the May 2014 report from plaintiffs.  Plaintiffs have not supported their claim of unfairness by citation to any authority.  It is not persuasive.

Plaintiffs also invoke a more traditional Rule 702 attack.  They assert that Dr. Matamoros's opinion will not aid the trier of fact because Dr. Matamoros will not testify to any

cause of settlement.  Plaintiffs claim that "Dr. Matamoros stated in his deposition . . . that he *will not opine or offer any expert opinions on* what caused the [p]laintiff's house to suffer a drop in the slab on grade floors in the kitchen and master bedroom ."  Doc. 85 at 4 (*emphasis in original*).  But, as defendant points out, it retained Dr. Matamoros for his expertise in earthquake damage.  Doc. 84-7.  And, in the same deposition that plaintiffs quote, Dr. Matamoros testified that he will offer an opinion about what caused the settlement "[t]o the extent that it's related to the earthquake events, and only that."  Doc. 85 at 6.  This disclosure refutes plaintiffs' re-characterization of Dr. Matamoros's opinion.  No basis for excluding his testimony under Rule 702 exists.

 **IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Partial Summary Judgment (Doc. 99) is denied.

 **IT IS FURTHER ORDERED THAT** plaintiffs' Motion for Summary Judgment on Collapse Damages (Doc. 94) is denied.

 **IT IS FURTHER ORDERED THAT** plaintiffs' Motion for Summary Judgment on Fire/Mold Damages (Doc. 96) is denied.

 **IT IS FURTHER ORDERED THAT** plaintiffs' Motion to Exclude Testimony of Dr. Matamoros (Doc. 60) is denied.

 **IT IS SO ORDERED.**

 **Dated this 22nd day of September, 2016, at Topeka, Kansas.**

       **s/ Daniel D. Crabtree**
       **Daniel D. Crabtree**
       **United States District Judge**